UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CHRISTOPHER J. RYAN, as the | ) | |
| Liquidation Agent for the Class 7 Claimants | ) | |
| of the Confirmed Chapter 11 Plan of | ) | |
| Reorganization of Couba Operating | ) | |
| Company, | ) | |
| | ) | |
| Plaintiff, | ) | Case Number:  O6-CV-022-TCK-SAJ |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN NATURAL ENERGY | ) | |
| CORPORATION, an Oklahoma | ) | |
| Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

The above-styled case was tried to the Court without a jury on February 8, 2007.[1]  After

considering the pleadings, the testimony and exhibits admitted at trial, all of the briefs and

arguments presented by counsel for the parties, the Court enters the following Findings of Fact and

Conclusions of Law in accordance with Federal Rule of Civil Procedure 52:

I.      **Findings of Fact**

*Couba Bankruptcy and Settlement*

1.      Couba Operating Company ("Couba") filed Chapter 11 bankruptcy in the United States

        Bankruptcy Court for the Western District of Oklahoma (the "Bankruptcy Case").  Plaintiff

---

[1] Following trial, the parties made several joint requests for extensions of time within which to file their Proposed Findings of Fact and Conclusions of Law, informing the Court each time that "the purpose for the extension is so that the parties may attempt to consummate a settlement in this matter."  (*See* Docs. 75, 85, 91.)  The Court granted each request.  The parties were unable to reach a resolution, and the parties filed their Proposed Findings of Fact and Conclusions of Law in August of 2007.

in this lawsuit, Christopher Ryan ("Ryan"), is the Liquidation Agent for the Class 7 creditors ("Class 7 Creditors") in the Bankruptcy Case. Class 7 Creditors filed claims in the Bankruptcy Case totaling $4,507,267.07.

2.      As a result of settlement negotiations in the Bankruptcy Case, Couba agreed to assign two oil and gas leases located on several hundred acres in St. Parish, Louisiana, to American Natural Energy Corporation ("ANEC"), the Defendant in this lawsuit. The leases assigned from Couba to ANEC are referred to in relevant documents as the Bayou Couba Lease and the Waterford Lease (the "Leases").[2]

3.      As a further result of settlement negotiations in the Bankruptcy Case, ANEC agreed to convey certain interests in the Leases to Class 7 Creditors. Specifically, ANEC agreed to convey an overriding royalty interest ("ORI") and a net profits interest ("NPI") in the Leases to Class 7 Creditors. In addition to conveying an ORI and NPI in the Leases, ANEC also agreed to convey a NPI in any wells drilled on a 23.5 square mile area surrounding the Leases. This area surrounding the Leases is referred to in the relevant documents as the Area of Mutual Interest ("AMI").

4.      At the time of settlement negotiations in the Bankruptcy Case, Ryan was the chairman of the Class 7 Creditor's committee. Ryan negotiated with ANEC's President, Michael Paulk ("Paulk"), and other of Couba's creditors in securing the above-described interests in the Leases and AMI for Class 7 Creditors.

5.      On November 16, 2001, the Bankruptcy Court entered an Order Confirming Plan, which

---

[2] Although listed in the relevant documents, the "Waterford" lease was not mentioned at trial. All parties referred to the lease at issue as simply the "Bayou Couba Lease."

confirmed the Second Amended Joint Plan of Reorganization Proposed by Couba Operating Company, American Natural Energy Corporation, and Gothic Resources, Inc. (the "Plan").[3] The Plan memorialized the settlement negotiations in the Bankruptcy Case.  Attached as Exhibits A-1 and A-2 to the Plan are unexecuted documents that reflect the agreements reached between ANEC and Class 7 Creditors regarding the conveyances of ORI and NPI.

6.      As contemplated by the Plan, Couba assigned the Leases to ANEC.  As further contemplated by the Plan, on December 28, 2001, ANEC executed a Conveyance of Net Profits Interest ("Conveyance of NPI" or "Conveyance"), whereby ANEC conveyed to Class 7 Creditors a NPI in (1) oil and gas produced on the Leases, and (2) oil and gas produced on the AMI. On the same date, ANEC executed a Conveyance of Overriding Royalty Interests ("Conveyance of ORI"), whereby ANEC conveyed to Class 7 Creditors an ORI in the oil and gas produced on the Leases.[4]

7.      Pursuant to the Conveyance of NPI, wells are divided into two general categories – those that existed as of the effective date of the Plan (defined in all relevant documents as "Existing Wells") and those that are drilled on either the Leases or the AMI after the effective date of the Plan (defined in all relevant documents as "New Wells").  Class 7 Creditors were to receive 50% of net profits attributable to Existing Wells, 15% of net profits attributable to New Wells drilled on the Leases, and 6% of net profits attributable to New Wells drilled on the AMI.

-----

[3]  The Plan is Plaintiff's Trial Exhibit 4.

[4]  The Conveyance of NPI is Plaintiff's Trial Exhibit 10.  The Conveyance of ORI is Plaintiff's Trial Exhibit 11.  These are executed versions of Exhibits A-1 and A-2 to the Plan.

*Activity on Leases and AMI Following ANEC's Acquisition of the Leases*

8.      At the time ANEC acquired the Leases from Couba, the field containing the Leases needed significant maintenance, which ANEC completed.

9.      ANEC refurbished and restarted production on approximately five to seven Existing Wells.

10.     ANEC drilled fifteen New Wells on the Leases.

11.     After reaching an agreement with the owner of the AMI, ANEC attempted to drill two wells on the AMI.  Both attempts at drilling on the AMI were unsuccessful and resulted in dry holes.

12.     ANEC produced annual reports to Ryan regarding oil and gas production on the Leases and the AMI.  ANEC reported each year that there were no net profits due and owing to Class 7 Creditors.

13.     ANEC has lost significant money every year and has never made a profit on the Leases.  Nor has ANEC made a profit on its drilling activities on the AMI.

14.     Ryan never informed ANEC that he believed net profits were due and owing to Class 7 Creditors.  Ryan had several opportunities to do so, including in-person meetings with ANEC executives that occurred in Houston, Texas.  At one such meeting, Ryan admitted there had been no net profits to date.

15.     ANEC learned that Ryan believed net profits were due only after Ryan filed this lawsuit. Ryan formed the belief that net profits were due and owing after hiring Walter Thomas ("Thomas"), a Certified Public Accountant specializing in the oil and gas industry, to analyze whether any profits were due and owing.

4

*Parties' Calculations of NPI*

16.     On January 11, 2006, Ryan brought this lawsuit alleging ANEC owed Class 7 Creditors

certain amounts pursuant to the Conveyance of ORI and the Conveyance of NPI.  The parties

settled all issues related to the Conveyance of ORI, and the Court entered an Agreed

Judgment in favor of Ryan in the amount of $365,723.74.[5]  Thus, the sole issue at trial was

whether there are any amounts due and owing Class 7 Creditors pursuant to the Conveyance

of NPI.

17.     Ryan contended that, as of May 2006, ANEC owed $1,424,766.41 in unpaid net profits.

This amount is set forth in an attachment to an expert report ("Report") prepared by Thomas.

The original Report is Plaintiff's Trial Exhibit 6.  The attachment to the Report reflecting the

total amount of NPI owed was revised twice by Thomas.  The first revision is Plaintiff's

Trial Exhibit 15.  The final revision, which contains the $1,424,766.41 amount, is Plaintiff's

Trial Exhibit 15A.  According to Exhibit 15A, this $1,424,766.41 amount was calculated

"based on annual production periods."

18.     To prepare his Report, Thomas traveled to Tulsa and reviewed ANEC's books and records.

Thomas testified as follows regarding his methodology:

> In calculating net profits interest, I basically started with the conveyance of net
> profits . . . and familiarized myself with various provisions and articles of the plan,
> and then I proceeded and used the lease operating reports received from ANEC and
> recorded on various spreadsheets *on a well-by-well basis* the revenue, lease operating
> expenses for each of those wells.  From the lease operating expenses, I subtracted
> depreciation and overhead and some other expenses that I didn't consider direct costs
> and then reduced that amount by capital expenditures to come up with a net profit
> amount.

---

[5]  This Agreed Judgment has been satisfied and released.

(Trial Tr. 67-68) (emphasis added).

19.     Thomas calculated net profits individually for each of the fifteen New Wells.  In his

calculation set forth in Plaintiff's Trial Exhibit 15A, Thomas chose to include only the five

"profitable wells," which were Well 92, Well 109ST, Well 111ST, Well 143, and Well 145.

(*Id.* at 69.)  Thomas did not include the ten New Wells that were "net loss wells."  (*Id.*)  Nor

did Thomas include any calculations that he made regarding Existing Wells.

20.     Thomas made the decision to complete his calculations on a "well-by-well basis" based on

his understanding of the Conveyance and the Plan.  Ryan did not give Thomas any direction

as to the interpretation of the Conveyance but instead felt that Thomas was capable of

reading and interpreting the document himself.

21.     Ryan is also of the opinion that the net-profits calculation must be completed on a well-by-

well basis.  Ryan explained the basis for his opinion as follows:

> The basis I have, sir, is that I was the chairman of the unsecured creditor's
> committee.  I negotiated with Wiser Oil, and then eventually ANEC, about how this
> net profit would, in fact, be calculated; how the override would work; that it would
> be done very simply; that the unsecured creditor's committee could, in fact, be paid
> what they're entitled to.  That was the deal that was made.

(*Id.* 38-39.)

22.     In contrast to Ryan, ANEC contends that no amounts of net profits are due and owing

because ANEC has not yet made any profits.  ANEC's Chief Financial Officer, Steven Ensz

("Ensz"), prepared a document entitled "Summary Net Profits: Bayou Couba Field"

("Summary"), which is Defendant's Trial Exhibit 1.  According to the Summary, ANEC

does not owe any net profits for purposes of the Conveyance of NPI because ANEC has

incurred a net loss when the costs associated with all wells – including Existing Wells, New

6

Wells drilled on the Leases, and dry holes drilled on the AMI – are aggregated and carried forward from year to year. Ensz concluded that there exists a total net loss in the amount of $14,915,517.00.

23. Ensz reached his net loss calculation by aggregating costs associated with all wells on the Leases and the AMI and aggregating all net profits for each of the years 2001-2006. ANEC's position is that, until they have recouped their total amount of costs, no amount of net profits is due and owing. In this regard, Ensz testified:

> Until such time as the revenues catch up with the costs to drill and develop and produce the wells that are part of this *net profit system*, there wouldn't be a net profit. . . . With the scenario that exists today where we have incurred the expense of, I think it's three nonproductive wells, there are significant costs yet to recoup, and that if we continue to drill, there will be additional costs to recoup. And until that's done, there will not be any net profit.

(*Id.* 140-41 (emphasis added).) According to Ensz, the wells are a "net profit system," and Thomas erred in performing his calculations on a well-by-well basis.

24. Ensz selected this methodology of calculating net profits based on his interpretation of the relevant documents and his understanding of the settlement negotiations in the Bankruptcy Case. According to Ensz, it was never contemplated at the time of reaching the settlement that net profits would be calculated on a well-by-well basis.

25. The primary dispute is whether, pursuant to the Conveyance of NPI, costs may be aggregated and carried forward in calculating net profits or whether net profits are to be calculated on a well-by-well basis and considering only costs incurred during the monthly Production Period.

26. A secondary dispute is whether certain specific costs shown on Defendant's Trial Exhibit 1, such as costs associated with acquisition of the Leases, qualify as direct costs that reduce

7

the amount of net profits owed.

*The Conveyance of NPI*

27.     The Conveyance was drafted by the Class 7 Creditor's committee following negotiations

between relevant parties in the Bankruptcy Case.

28.     The Conveyance contains the following relevant definitions:

a.   "'Net Profits' means Proceeds reduced by Direct Costs."

b.   "'Proceeds' for any Production Period means the gross proceeds from sale or other

disposition of all Oil and Gas produced during such Production Period from Existing Wells

and New Wells located on the Leases.  Proceeds attributable to Existing Wells shall be

determined separate and apart from Proceeds attributable to New Wells."

c.   "'Direct Costs' means for any Production Period, on the cash method of accounting, all

little[6] direct costs attributable to generating Proceeds including the following costs

attributable to the working interest of ANEC or its Affiliates in Existing Wells or New

Wells. (i) production and severance taxes, ad valorem taxes, royalties, overriding royalties,

and other burdens upon production (excluding the burden established by this Agreement);

(ii) operating expenses incurred in accordance with the terms of the applicable Joint

Operating Agreement, or in the event no such Joint Operating Agreement can be located,

then those costs of operation set forth in the most recent version of the COPAS Accounting

Procedures Exhibit to the AAPL Model Form Operating Agreement. [sic] (iii) drilling and

completion costs, and costs of plugging back, reworking, recompleting, plugging and

--------

[6]  The parties agree, and the Court finds, that "little" is a scrivener's error that has no
meaning in the context of this definition.

abandoning after commercial production; (iv) costs of marketing, transportation, and treatment of Oil and Gas."

d. "'Direct Costs Accounts' means a bookkeeping accounts established by ANEC to record the aggregate amount of unrecouped Direct Costs attributable to the interest of ANEC or its Affiliates in Existing Wells or New Wells. Direct Costs for Existing Wells and New Wells will be recorded in separate sub-accounts. Each account shall have an initial balance of zero and shall be increased at the close of each Production Period by Direct Costs (if any) incurred during such Production Period, and shall be decreased at the close of each Production Period by the amount of Net Proceeds received from sale of Oil and Gas during such Production Period. The balance of the Direct Costs Account shall never be less than zero."

e. "'Existing Wells' means existing wells shall have the meaning set forth for such term in the Plan [the Second Amended Joint Plan of Reorganization Proposed by Couba Operating Company, American Natural Energy Corporation, and Gothic Resources, Inc.]."[7]

f. "'New Wells' means wells drilled on Bayou Couba Lease or the Waterford Lease after the Effective Date, and wells drilled on lands located within the Area of Mutual Interest after the Effective Date."

g. "'Area of Mutual Interest' means the 23.5 square mile area, more or less, outside the Bayou Couba Lease and the Waterford lease that is covered by the 3D seismic shoot performed at the request of Couba Operating Company by Eagle Geophysical."

---

[7] According to the Plan, "Existing Wells" "[s]hall mean wells that exist on the Bayou Couba Lease as of the Effective Date."

29.     The Conveyance contains the following relevant provisions:

a. "<u>2.1 Conveyance of Net Profits Interest.</u>  Assignor hereby grants . . . unto the Liquidation Agent a net profits interest (the "Net Profits Interest") in and to all of the Oil and Gas produced from the Leases, if, as, and when Oil and Gas are produced during the terms of the Leases and any and all renewals and extensions thereof.  The interest conveyed hereby represents the right to receive payments of proceeds from sale of Oil and Gas, and does not represent a working interest or other participating cost-bearing interest."

b. "<u>2.2 Existing Wells Net Profits Interest Amount.</u>  The net profits interest conveyed hereby shall equal 50% of Net Profits attributable to Existing Wells during each Production Period."

c. "<u>2.3 New Wells Net Profits Interest Amount – Bayou Couba Lease and Waterford Lease.</u>  The net profits interest conveyed hereby shall equal 15% of Net Profits attributable to New Wells drilled on the Bayou Couba Lease and the Waterford Lease during each Production Period."

d. "<u>2.4 New Wells Net Profits Interest Amount – AMI [Area of Mutual Interest] Leases.</u>  The net profits interest conveyed hereby shall equal 6% of Net Profits attributable to New Wells drilled on lands located within the AMI during each Production Period."

e. "<u>3.2 Statements.</u>  On or before each Payment Date, Assignor shall furnish . . . to the Liquidation Agent a detailed statement clearly reflecting, for Existing Wells and New Wells separately, Proceeds, Direct Costs, credits and debits against the Direct Costs Account for the Production Period, and the balance of the Direct Costs Account as of the close of the business on the last day of the preceding Production Period."

10

f.  "<u>6.1 Books and Records.</u>  Assignor shall at all times maintain true and correct books and records sufficient to determine the amounts payable to Liquidation Agent . . . and information relating to the calculations of Proceeds, Direct Costs, the balance of the Direct Costs Accounts, and the amounts payable to Liquidation Agent hereunder, in each case both for Existing Wells and for New Wells."

g.  "<u>6.3 Annual Report.</u>  . . . Assignor shall deliver to Liquidation Agent a report showing: (i) the production of Oil and Gas from the Leases, and a computation of Proceeds and Direct Costs Account at the end of such calendar year; (ii) the names and locations of producing wells located on the Leases, any wells completed on the Leases during the calendar year with the completion status thereof, and in each case, classification of the wells as Existing Wells or New Wells . . . ."

30.   To the extent any of these Findings of Fact constitute Conclusions of Law, they should be so considered.

**II.     Conclusions of Law**

1.    The Conveyance is construed as a contract between ANEC and the Liquidation Agent for the Class 7 Creditors in the Bankruptcy Case.  *Cronkhite v. Falkenstein*, 352 P.2d 396, 298 (Okla. 1960) (holding that oil and gas leases and deeds are to be "construed and interpreted as other contracts").  In construing the Conveyance, the Court's primary purpose is to give effect to the mutual intention of the parties as it existed at the time of contracting.  *Id.*

2.    The Conveyance is ambiguous because it is susceptible to different interpretations as to the proper calculation of NPI.  *See Pitco Prod. Co. v. Chaparral Energy, Inc.*, 63 P.3d 541, 545-46 (Okla. 2003) ("A contract is ambiguous if it is reasonably susceptible to at least two

11

different constructions.  To decide whether a contract is ambiguous we look to the language of the entire agreement.").  The following aspects of the Conveyance could be read to mean that all costs associated with developing the Leases and AMI must be recouped by ANEC before any net profits are due and owing to Class 7 Creditors on profitable wells: (1) the definition of Direct Costs Accounts, which requires ANEC "to record the *aggregate* amount of *unrecouped* Direct Costs attributable to the interest of ANEC or its Affiliates in Existing Wells *or* New Wells;" and (2) the definition of Direct Costs, which includes "*all* [] direct costs attributable to generating Proceeds . . .  in Existing Wells *or* New Wells."  In contrast, the following aspects of the Conveyance could be read to mean that costs cannot "cross over" from well to well and cannot be carried forward from year to year:  (1) the definition of Direct Costs Accounts, which states that Direct Costs for Existing Wells and New Wells must be recorded in separate "sub-accounts;" and (2) the fact that Direct Costs and Proceeds are tied to a monthly Production Period.  These are only a few examples of ambiguity created by the Conveyance in determining how net profits are to be calculated.[8]

3.    Because the Conveyance is ambiguous, the Court may consider extrinsic evidence in determining its meaning.  *See Pitco Prod. Co.*, 63 P.3d at 545-46 (Okla. 2003) ("Whether a contract is ambiguous and hence requires extrinsic evidence to clarify the doubt is a question of law for the court."); *Beattie v. State ex rel. Grand River Dam Auth.*, 41 P.3d 377, 382 (Okla. 2002) (holding that, if a contract is found to be ambiguous, extrinsic evidence may be used to determine the intent of the parties).

---

[8]  The parties agreed the Conveyance is ambiguous, and both parties relied extensively on extrinsic evidence in support of their respective positions.

4.      As an ambiguous contract, the Conveyance must be interpreted in a "manner which is fair and reasonable rather than in a manner which would reach an inequity." *McMinn v. City of Okla. City*, 952 P.2d 517, 522 (Okla. 1997).

5.      The Conveyance must be construed against Ryan and Class 7 Creditors, who were the drafters of the Conveyance. *See id.* ("If terms in the contract are ambiguous, it must be construed against the drafter of the contract.").

*Aggregate v. Well-by-Well*

6.      ANEC's interpretation of the Conveyance, which allows it to (1) aggregate direct costs associated with all wells, (2) aggregate revenues from all wells, and (3) pay net profits only on specific wells in the event that aggregate revenues exceed aggregate direct costs, best comports with the language of the Conveyance and leads to the most "fair and reasonable" interpretation of the Conveyance.

7.      ANEC's interpretation best comports with the definition of "Direct Costs," which includes "all" direct costs that are "attributable to generating proceeds" in "Existing Wells or New Wells." This is a broad, inclusive definition. It indicates, for purposes of determining whether a net profit is owed, that ANEC is entitled to aggregate its costs, regardless of whether such costs were associated with Existing Wells or New Wells.

8.      It is not possible to separate certain items listed as "Direct Costs" on a well-by-well basis, indicating that the parties contemplated that "Direct Costs" would be calculated in the aggregate. For example, an item listed as a "Direct Cost" is the "costs of marketing, transportation, and treatment of Oil and Gas." The Leases in this case are on a field that is under water, and all oil and gas must be transferred collectively via pipeline. Therefore, it

13

is impossible to complete a "well-by-well" assessment of the costs of marketing, transportation, and treatment of the oil and gas.

9.  ANEC's interpretation best comports with the Court's view of the negotiations between the Class 7 Creditors and ANEC in settling the Bankruptcy Case.  Specifically, the parties anticipated that ANEC would have to produce a significant amount of oil and gas for the NPI to ever become payable, and there was never any guarantee that Class 7 Creditors would receive payments based on their NPI.  This is why the parties also negotiated the Conveyance of ORI, which would create a more immediate cash flow for Class 7 Creditors. In this regard, the Court finds credible the following testimony of Paulk:

> [The lease] we acquired from Couba Operating subsequent to the reorganization is primarily a unit.  It had some existing properties on it, but if anybody was going to make any money, it obviously needed to be developed. . . . And the company anticipated that there was a lot of oil and gas potential, but it was going to take a lot of money to achieve it. . . . In anticipation of that, we anticipated that we would have to produce a lot of oil and gas in order for net profits interest to kick in  in.  Therefore, knowing that it was going to take a substantial amount of time and money, we agreed to an override to the Class 7 in order to have some cash flow that direction.

(Trial Tr. 156.)

10.  The Conveyance's creation of "subaccounts" for Existing Wells and New Wells does not convince the Court that net profits must be calculated on a well-by-well basis.  There is a simple and credible explanation of the need for sub-accounts.  In the event the aggregate costs are eventually recouped, Class 7 Creditors are entitled to a different percentage of net profits depending on the type of well to which the net profit interest is attributable. Therefore, sub-accounts are necessary for determining the percentage of net profits owed (50% for Existing Wells, 15% for New Wells drilled on the Leases, 6% for New Wells drilled on the AMI).  In addition, the "sub-accounts" referenced in the definition of Direct

14

Costs Accounts are merely divided into Existing Wells and New Wells. Thus, even were the Court to accept Ryan's theory that the division into sub-accounts somehow necessitates calculation of revenue and profit for that subaccount only, this still would not result in a well-by-well calculation such as that completed by Thomas.

11.     The Conveyance's references to monthly "Production Periods" does not convince the Court that costs may not be carried forward from one monthly Production Period to the next or from one annual year to the next. Subsequent provisions in the Conveyance, specifically the "Direct Costs Accounts" definition, convince the Court that ANEC is permitted to "aggregate" all of its "unrecouped Direct Costs attributable to the interest of ANEC or its Affiliates in Existing Wells or New Wells" for purposes of determining whether net profits are payable in any given Production Period. The term "unrecouped" is particularly important because it indicates that costs may be carried forward until they are in fact "recouped" by aggregate oil and gas proceeds. This conclusion is further supported by Section 3.2 of the Conveyance, which authorizes the balance of the Direct Costs Account to be carried forward, as well as by Section 6.3(i), which requires the Annual Report to show "the production of Oil and Gas from the Leases, and a computation of Proceeds and Direct Costs for such year, and the balance of the Direct Costs Account at the end of such calendar year." This indicates that the Direct Costs Account may be carried forward from year to year until it reaches a zero balance.

12.     In addition, there was no testimony presented by Ryan or Thomas that convinces the Court that the net profits calculation must be completed on a well-by-well basis. Specifically, Ryan offered no meaningful explanation of the negotiation process that supported his

position that net profits were to be calculated on a well-by-well basis. Thomas merely looked to the relevant provisions of the Conveyance and the Plan, and the Court rejects this interpretation of such documents.

13.   The following trial testimony is the most credible and logical explanation of the "Direct Costs Accounts" definition:

| | |
|---|---|
| Q: [Mr. Edwards] | [T]he direct costs account it's talking about right there is unrecouped direct costs attributable to the interest of ANEC or its affiliates in existing or new wells; that's total, isn't it? It says aggregate? |
| A: [Mr. Ensz] | Yes. |
| Q: | Then the revenue reduces that account, and it's only when the account gets to zero that you start looking at the subaccounts to decide the amount of the net profits interest, depending on whether it's an existing or new well; is that correct? |
| A: | That's correct. |

(*Id.* 147.)

14.   ANEC is authorized, pursuant to the Conveyance, to aggregate and "recoup" all its direct costs – regardless of whether such costs were incurred during the monthly production period and regardless of whether such costs are associated with Existing Wells or New Wells – before it has an obligation to pay net profits on any individual well that is making a profit.

15.   All Existing Wells and New Wells, whether drilled on the Leases or the AMI, were intended to be viewed as a "net profit system." Therefore, net profits were only intended to kick in at a point in time after ANEC recouped costs associated with the entire "system" rather than at a point in time when one individual well became profitable.

16.   Plaintiff's Trial Exhibit 15A is rejected because it attempts to calculate net profits based solely on the costs and revenues associated with an individual well, without regard to the profitability of other Existing Wells and New Wells. This is not a fair interpretation of the

16

Conveyance because ANEC would be forced to pay net profits on individual profitable wells regardless of whether ANEC has earned net profits on the Leases and AMI as a collective net profit system.

17.     The general methodology employed in Defendant's Trial Exhibit 1 – the aggregation of costs and revenues for all wells – is proper.

*Court's Calculation of NPI*

18.     In large part, the Summary set forth in Defendant's Trial Exhibit 1 represents the proper calculation of NPI owed.

19.     One item, however, was erroneously in the Summary as a Direct Cost.  The $6,268,483.00 expense listed as "Bayou Couba Acquisition" was described by Paulk as "the costs of acquiring the Bayou Couba project, which included a number of costs out of the bankruptcy – or to get it out of bankruptcy, I guess, is the best way to put it." (*Id.* 148.)  Such costs included approximately $3,000,000.00 to pay off a bank note and first mortgage on the property.  The remainder included costs associated with the bankruptcy proceeding, such as attorney fees incurred in such proceeding.  Such costs do not fall within the definition of "Direct Costs" in the Conveyance of NPI  because they are not "attributable to generating proceeds."  Nor are they similar to any of the examples provided of "direct costs," which include taxes, royalties, operating expenses, drilling expenses, and marketing expenses.  It is not a fair or reasonable construction of the Conveyance to allow ANEC to recoup the costs of getting the subject property "out of bankruptcy."  These costs were anticipated and obvious at the time of the settlement negotiations and the Conveyance.  Had ANEC successfully negotiated these costs to be included as costs reducing net profits owed, ANEC

should have insisted on a more explicit provision in the Conveyance or an inclusion of all relevant "acquisition costs" as part of the definition of "Direct Costs."

20.    The Court rejects Ryan's contention that the amount of "Field Start Up Costs" set forth in the Summary must be reduced by $1,100,000.00 based on certain language in the Plan.  In a section of the Plan entitled "Means for Performing the Plan and Management of the Reorganized Debtor," the Plan provides that "ANEC and Gothic are further committing under the Plan to spend up to $1,100,000.00 to restore Existing Wells to production and to evaluate the advisability of drilling New Wells."  (Plaintiff's Trial Ex. 4 at 14.)  Ryan contends, based on this language, that the $1,130,710.00 expense for "Field Start-Up Costs" must be reduced by $1,100,000.00.  However, such costs clearly satisfy the definition of "Direct Costs" under the definition in the Conveyance of NPI because they are "attributable to generating proceeds."  The Plan language relied upon by Ryan is merely an agreement that, upon obtaining the property, ANEC would expend money to restart the field.  This does not the equivalent of an agreement that such amount would not qualify as a Direct Cost reducing the net profits owed.  No Plan language and no Accordingly, the "Field Start Up Costs" will be included as an expense in the amount of $1,130,710.00.

21.    In sum, ANEC improperly included $6,268,483.00 as costs reducing the amount of net profits owed.

22.    Based on the Court's revisions to the Summary contained at Defendant's Trial Exhibit 1, ANEC has, as of October 2006, incurred a net loss of $8,647,034.00.

23.    Ryan is not entitled to any net profits, and ANEC is entitled to judgment in its favor.

18

24.    To the extent any of these Conclusions of Law constitute Findings of Fact, they should be so considered.

IT IS SO ORDERED this 30th day of November, 2007.

**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**